[No. B255953. Second Dist., Div. One. Oct. 4, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
DIANE C. ASBURY, Defendant and Appellant.

[No. B269063. Second Dist., Div. One. Oct. 4, 2016.]

In re DIANE C. ASBURY on Habeas Corpus.

**COUNSEL**

Law Offices of Dennis A. Fischer, Dennis A. Fischer and John M. Bishop for Defendant and Appellant.

James H. Barnes for Petitioner.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ROTHSCHILD, P. J.**—Appellant Diane C. Asbury challenges her conviction for the murder of her former longtime boyfriend Anthony Simiele. Simiele came to Asbury's house to reclaim some belongings he had left in her garage. They argued, and when he followed her upstairs to her bedroom, she pulled out a handgun she kept near her bed and shot him. Asbury raises several challenges to her conviction, both on direct appeal and in a petition for a writ of habeas corpus. We reverse her conviction on the ground that the trial court erred by refusing to instruct the jury regarding voluntary manslaughter under a heat of passion theory. We deny the petition for a writ of habeas corpus.

### FACTS AND PROCEEDINGS BELOW

Asbury and Simiele had been in a relationship for most of 26 years and lived together for 20 of those years. They never married, but Simiele was the father of Asbury's 23-year-old daughter Victoria. Although they had previously had several brief separations over the years, the couple broke up permanently in October 2010, when Simiele moved out of the house Asbury owned. Asbury had suffered from breast cancer and depression, and she believed Simiele had not done enough to take care of her when she was sick.

According to Mary Huang, Simiele's girlfriend of three months, on April 24, 2011, Asbury went to Simiele's house unannounced, arriving as they were about to eat Easter dinner. Simiele invited Asbury into the house and introduced her to Huang. When Huang told her she had been dating Simiele for a few months, Asbury became visibly angry. Simiele and Asbury argued about their bills and mortgage, and about their daughter Victoria. Asbury admitted that at one point, she called Huang a "f-ing C" and told her to "wait until you have cancer." According to Huang, Simiele accused Asbury of having held a gun to Victoria's head when Victoria was sick, and then to her own head. Asbury did not respond to the accusation. Huang testified that Asbury did not appear to be afraid of Simiele. According to Asbury, after this incident, her depression worsened, and she could not stop crying.

Asbury's friend Patricia Love testified that Asbury told her about the Easter confrontation. In their daily conversations, Asbury often told Love that she was upset that Simiele had a new girlfriend, and sometimes told her that

she was upset that she was no longer with Simiele. Asbury later told police that she was ambivalent about whether she wanted to get back together with Simiele. Asbury told Love that she drove past Simiele's house looking for Simiele's and Huang's cars. Love cautioned Asbury to stop and believed Asbury was obsessed about Simiele and Huang's relationship. Love told Asbury it was not a good idea for Asbury to keep a gun in her home, but Asbury told her that she needed the gun in case Simiele ever attacked her. Asbury did not tell Love that Simiele had ever attacked her in the past, but she did tell Love that Simiele had once threatened to "call [her] out" in front of their peers and friends, and that he had once headbutted their daughter. Asbury later told police that Simiele had screamed at her, slammed tables, and threatened their daughter Victoria. Although he had once hit her when she threatened to have an abortion, Asbury admitted that he had not been violent toward her recently.

According to Asbury, she and Simiele, along with Victoria, attended a wedding in San Francisco in early May 2011. Asbury became upset because she thought Simiele was monopolizing Victoria.

Asbury gave the only account of what happened on the day of the shooting. She told police that Simiele called her to arrange to pick up possessions he had left in her garage. Because Asbury worked at night and would be sleeping during the day on Sunday, she requested that he come on Monday. He agreed. Simiele came to Asbury's house on the afternoon of Sunday, May 29, 2011, and banged on the door until Asbury let him in. They argued. According to Asbury, Simiele picked up a hammer from the floor, saying it belonged to him. Asbury told Simiele she was going to bed, and he should not follow her. In spite of this request, Simiele followed her upstairs, saying he had a right to do so. When police later searched Asbury's residence, the only hammer they discovered was a sledgehammer on the lower level of the house. Asbury did not remember seeing it when Simiele went upstairs. Asbury told Simiele to leave, but he stayed in the room and kept yelling at her. Simiele told Asbury that if she wanted to confront him again, she should bring her "tough guy friends." Asbury picked up the handgun she kept by her bed and told Simiele to leave. Asbury told friends that she kept a gun in her house for protection, including from Simiele. She had owned the gun for approximately 20 years, and had bought ammunition for it only about a month earlier. Asbury had suffered from breast cancer, and had surgery for a double mastectomy. This surgery had compromised her strength, and at the time of the shooting, she struggled when trying to lift 25 pounds. Simiele took one step toward Asbury, and she felt afraid that he was going to attack her and strangle her. She fired the gun. According to a firearms expert, Asbury fired this shot at a distance of approximately four feet away from Simiele. The bullet traveled upward from the gun, but it exited Simiele's body at a lower point than where it entered. The expert concluded

from this that Simiele was either leaning forward toward Asbury or covering his face with one leg off the ground, shielding himself from the bullet. The bullet struck Simiele on the left side of his torso, below his ribs.

Simiele jumped at Asbury and tried to wrestle the gun away from her. In the process, he fell on top of Asbury. She fired the gun again. A firearms examiner testified that the trajectory analysis indicated that Asbury had fired this second shot with the gun resting against her thigh, and that the bullet had traveled through her pants at an upward angle. According to the examiner, this was consistent with Asbury lying on her back and struggling over the weapon with Simiele.

Asbury called 911 on her cell phone and started performing CPR. She ran down the stairs, put the gun in a pile of laundry, and ran out of the house. She told the 911 dispatcher that Simiele had come to her house and started attacking her, and so "I got my gun and I shot him."

Police officers and paramedics appeared on the scene, but they were unable to save Simiele's life. Asbury's only injuries were a bruise on her leg and a scratch on her wrist.

After the shooting, police officers searched Asbury's cell phone. They found a picture of Simiele's truck and another of a firearms range target. In approximately 1,200 text messages between Asbury and her daughter Victoria, there was no mention of any headbutting or other act of violence by Simiele to Victoria, nor any warning from Asbury that Simiele might be dangerous. Phone records showed that Asbury had called Simiele on seven days in April and May, including the day before the shooting, and that Simiele had called Asbury twice the day before the shooting.

An information charged Asbury with one count of murder, in violation of Penal Code section 187, subdivision (a),[1] with an allegation that Asbury personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (c)–(d)), and that she personally used a firearm. (*Id.*, subd. (b).)

A jury found Asbury not guilty of first degree murder, but guilty of second degree murder. The jury also found true the allegation that Asbury discharged a firearm. The trial court sentenced Asbury to 15 years to life imprisonment for second degree murder, plus a mandatory consecutive term of 25 years to life for the enhancement, for a total term of 40 years to life in prison.

---

[1] Unless otherwise specified, subsequent statutory references are to the Penal Code.

## DISCUSSION

We address Asbury's direct appeal and her petition for writ of habeas corpus together in a single opinion.

### I. *The Direct Appeal*

Asbury raises several claims on appeal. She contends that the evidence proved as a matter of law that she killed Simiele in a heat of passion, and that consequently there was insufficient evidence to support a murder conviction, as opposed to voluntary manslaughter. Alternatively, she argues that the trial court erred by refusing to instruct the jury regarding a heat of passion theory of voluntary manslaughter. Next, she contends that the trial court undermined the integrity of her trial by severely limiting voir dire. Next, she contends that the trial court erred by denying her motion for a new trial made on the ground that her attorney provided ineffective assistance of counsel by failing to investigate and present expert testimony regarding intimate partner battering. Finally, she contends that the prosecution committed misconduct during closing argument by misstating the burden of proof beyond a reasonable doubt. We agree with Asbury's argument regarding jury instructions, and we reverse her conviction.

#### A. *Heat of Passion Instruction*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

#### B. *Limitations on Voir Dire*

Asbury contends that the trial court abused its discretion by limiting the time for her trial counsel to question potential jurors during voir dire to only 25 minutes, with no extensions available for further questioning. Even if the court erred in so limiting the questioning, we nonetheless hold that Asbury is not entitled to reversal of her conviction because she has not shown that, as a result of the limitation, her trial was fundamentally unfair.

##### 1. *Proceedings Below*

Prior to jury selection, the trial court informed the parties how it intended to conduct voir dire. The court planned to ask the prospective jurors to answer a written questionnaire featuring 20 questions about their backgrounds, prior experiences with the legal system, their attitudes toward law

---

[*]See footnote, *ante*, page 1222.

enforcement, and their personal beliefs.[4] The court did not give the parties an opportunity to submit additional questions to supplement the questionnaire. The court allotted 20 minutes to each side for questioning jurors, including alternates, with no additional time provided depending on the number of potential jurors called. When jury selection began, the court called the first 12 potential jurors to the jury box and asked each to state his or her area of residence, occupation, marital status, spouse's occupation, number of children, and prior experience serving on juries. The court also asked each potential juror if he or she had responded "yes" to any of the questions on the questionnaire regarding personal experience with the justice system, attitude toward law enforcement, personal beliefs, and other similar issues.[5] In any case of a "yes" answer, the court asked each juror to explain the answer briefly. As this process went on, the court asked some of the jurors follow-up questions regarding their answers.

Once the court had finished, Asbury's counsel and the prosecution took their turns questioning the first group of 12 potential jurors. Next, the parties began exercising peremptory challenges. After each peremptory challenge, the court replaced the juror who had been excused with one replacement, and proceeded with voir dire of that new juror, asking him or her about any "yes" answers to the questionnaire, and asking follow-up questions. Asbury's attorney requested that, as a part of the court's own questioning of these new additions to the panel, the court ask each new prospective juror if he or she would have responded in the affirmative to any of the questions the lawyers had asked earlier.[6] The court granted that request. Asbury's attorney ran out of time after using only four of his 20 peremptory challenges. At this point, the court informed defense counsel that he had already used 25 minutes questioning jurors, and that he would not be permitted to ask further questions on voir dire unless "something explosive comes up." The court also

---

[4] The full text of the trial court's questionnaire is attached to this opinion as exhibit A.

[5] These were questions 6 through 20 in the court's questionnaire.

[6] During voir dire, Asbury's counsel had asked the jurors as a group the following questions: "[Is] anybody here . . . a member of the NRA?" "Is there anybody who is a member of [a] gun control organization, where they don't believe in guns?" "Is there anybody here because of the nature of the charges who feels that this is something they really—they would rather be on a drug case or they'd rather be on a DUI case?" "Is there anybody who disagrees with that . . . statement that . . . we decide a case on its facts and we look at each fact and try and place it in the context of the law?" The prosecutor asked the following questions of the jurors as a group during voir dire: "Does anybody think that because it is a woman defendant and a male victim that she is less likely to be guilty?" "[D]oes anybody think that because the defendant is a woman and the victim is a man that there is a stronger likelihood that self-defense is involved?" "Does anybody here think that if somebody is in your house you automatically have the right to use deadly force against them because they are in your house?" "Does anybody here have any issues or strong feelings about domestic violence, . . . one way or the other, whether the victim is a man or a woman?" "Does anything about [Asbury's] appearance make you think that she is less likely to be guilty?"

denied defense counsel's request to submit follow-up questions for the court to ask. Counsel did not specify the questions, their substance, or subject matter.

The court then continued questioning each new potential juror one at a time, in the same manner as before. Pursuant to the request from Asbury's attorney, the court also asked each prospective juror if he or she would have responded in the affirmative to any of the questions the lawyers had asked earlier. On one occasion, a prospective juror answered that her husband was a member of the NRA. The trial court did not ask any follow-up questions in response. The defense exercised two more peremptory challenges, and the prosecution exercised one. When the court placed new jurors to replace those who had been excused, defense counsel had some opportunity to question the new jurors through the court's asking whether the juror would have answered any of the attorney's questions to the panel in the affirmative. During trial, one juror was excused from service and replaced by an alternate, leaving four jurors on the panel whom the defense had not directly questioned.

## 2. *Discussion*

■ Although the issue is a close one,[7] given all the circumstances, Asbury is not entitled to a reversal. Code of Civil Procedure section 223 provides that "[t]he trial court's exercise of its discretion in the manner in which voir dire is conducted, including any limitation on the time which will be allowed for direct questioning of prospective jurors by counsel . . . , shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution." Although the "miscarriage of justice" standard is often equated with the "reasonable probab[ility]" test our Supreme Court established in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], this is not universally the case: "[T]he *Watson* decision did not purport to overrule or disapprove that portion of the [*People v. O'Bryan* (1913) 165 Cal. 55 [130 P. 1042]] decision recognizing that with regard to *some* errors—such as a denial of the right to jury trial—a 'miscarriage of justice' would result from the denial of the right itself, without regard to the state of the evidence." (*People v. Cahill* (1993) 5 Cal.4th 478, 492 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) Thus, in reviewing trial court decisions regarding jury selection, courts have not attempted to evaluate whether the defendant would have likely obtained a better outcome at trial in the absence of the error. Instead, they have examined whether the trial court's error "affected [the

---

[7] Although it is impossible to state an absolute rule regarding the minimum amount of time a trial court must provide for voir dire, it would be a better practice, at least when allowing a relatively short time for voir dire, to establish only a presumptive time limit and allow additional questioning upon a showing of good cause.

defendant's] right to a fair and impartial jury." (*People v. Yeoman* (2003) 31 Cal.4th 93, 114 [2 Cal.Rptr.3d 186, 72 P.3d 1166] [holding that the trial court's error in depriving defendant of peremptory challenges was harmless because no incompetent juror sat on the panel].)

■ Courts have reviewed cases involving restrictions on voir dire in this manner. In *People v. Holt* (1997) 15 Cal.4th 619 [63 Cal.Rptr.2d 782, 937 P.2d 213], our Supreme Court held that in order for reversal to be appropriate, "the voir dire by a court [must have been] so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair." (*Id.* at p. 661, citing *Mu'Min v. Virginia* (1991) 500 U.S. 415, 425–426 [114 L.Ed.2d 493, 111 S.Ct. 1899].) The court in *People v. Chapman* (1993) 15 Cal.App.4th 136 [18 Cal.Rptr.2d 738] described the standard for reversal in more concrete terms: " '[W]here . . . the trial judge so limits the scope of voir dire that the procedure used for testing does not create any reasonable assurances that prejudice would be discovered if present, he commits reversible error.' " (*Id.* at p. 141.)

■ There is no indication in the record that the court's limitation on voir dire resulted in a fundamentally unfair trial. Nothing in the record shows that any of the jurors were actually biased, and Asbury does not point to anything in the record suggesting that further questioning of a particular juror was necessary. Further, the trial court's questionnaire and follow-up questions to the individual jurors tested most of the common ways in which a prospective juror might be too biased to serve. Asbury points out that the questionnaire was not exhaustive and did not include all of the suggested areas for questioning included in the Judicial Council's Standards for Judicial Administration. But those standards are only "recommended," not mandatory for trial courts to follow in every detail. (*People v. Bolden* (2002) 29 Cal.4th 515, 538 [127 Cal.Rptr.2d 802, 58 P.3d 931].) Furthermore, the court's questionnaire in this case covered most of the areas described in the Judicial Council's standards, and most of the omissions and alterations from the standards were relatively minor.

■ The one area in which the trial court's questionnaire differed from the Judicial Council's standards in a significant way was with respect to race. The Judicial Council recommends that trial courts ask, where appropriate, "[i]t may appear that one or more of the parties, attorneys, or witnesses come from a particular national, racial, or religious group (or may have a lifestyle different from your own). Would this in any way affect your judgment or the weight and credibility you would give to their testimony?" (Cal. Stds. Jud. Admin., § 4.30, subd. (b)(20).) Asbury contends that her conviction must be reversed because the trial court did not ask jurors about their attitudes toward issues of race. Asbury is ethnically Chinese and speaks with an accent, while

Simiele was Caucasian. "In a case involving an interracial killing, . . . a trial court during general voir dire is required to question prospective jurors about racial bias *on request.*" (*People v. Bolden, supra,* 29 Cal.4th at p. 539, citing *Turner v. Murray* (1986) 476 U.S. 28, 36–37 [90 L.Ed.2d 27, 106 S.Ct. 1683].)

Asbury's attorney did not request that the trial court ask potential jurors about their attitudes toward race. Asbury argues that such a request was not necessary because it would have been futile (see *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 648 [130 Cal.Rptr.2d 873]), in that the trial court made clear that it would not allow the parties to request additions to the questionnaire. But the trial court granted Asbury's counsel's request that the court ask new prospective jurors if they would have responded in the affirmative to any of the questions Asbury's attorney had asked other jurors. If counsel had explained the relevance and what the standards recommend, it is not at all clear that the court would have denied the request. Most importantly, appellant has not demonstrated that questions on the subject were necessary in this particular case. Indeed, Asbury's attorney, in his judgment regarding the issues most important to the case, did not ask a single question regarding race to any of the prospective jurors during his 25 minutes of voir dire. If race was an important consideration, we would expect that he would have done so.

Asbury also argues that her conviction must be overturned because the trial court's imposition of a blanket time limit on voir dire was per se improper. She cites Code of Civil Procedure section 222.5, which provides that "[s]pecific unreasonable or arbitrary time limits shall not be imposed in any case. The trial judge shall not establish a blanket policy of a time limit for voir dire." By its own terms, however, that code section establishes rules "[t]o select a fair and impartial jury in *civil* jury trials." (*Ibid.,* italics added.) We are not persuaded that the provision barring blanket policies of time limits for voir dire applies more broadly than the remainder of the text in that section. This is especially true in light of the fact that the next section of the code explicitly addresses voir dire in criminal trials and provides that "[t]he court may, in the exercise of its discretion, limit the oral and direct questioning of prospective jurors by counsel. The court may specify the maximum amount of time that counsel for each party may question an individual juror, or may specify an aggregate amount of time for each party, which can then be allocated among the prospective jurors by counsel." (Code Civ. Proc, § 223.)

The trial court required all of these jurors to answer the questionnaire, asked follow-up questions to inquire about the jurors' affirmative answers in the questionnaire, allowed the attorneys to ask questions, albeit for a relatively short time, and asked if the jurors would have answered yes to any of

the questions Asbury's attorney had asked the other jurors. This procedure was not perfect, but in the absence of evidence suggesting that one of the jurors who decided the case was biased, it was not sufficiently flawed to require reversal.

C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *The Habeas Corpus Petition**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment of the trial court is reversed. On remand, the prosecution shall have the option to retry Asbury for second degree murder, or to accept a modification of the judgment to reflect a conviction for voluntary manslaughter. If the prosecution elects to accept the modification of the judgment, the trial court shall resentence Asbury in accordance with the modified judgment.

Chaney, J., and Johnson, J., concurred.

A petition for a rehearing was denied November 2, 2016, and appellant's petition for review by the Supreme Court was denied February 1, 2017, S238844.

---

*See footnote, *ante*, page 1222.

EXHIBIT A

**JUROR QUESTIONNAIRE**

<u>Instructions</u>:

**Please do not write on the questionnaire.**

**Read each question and note the question number to which you have a positive response.**

1. What is the general area of your residence? How long have you lived in that area?

2. What is your occupation?

3. What is your marital status?

4. What is your spouse's occupation?

5. How many children do you have?

   a. If you have any adult children, what are their occupations?

6. Have you had previous jury experience?

   a. How many times

   b. Criminal or civil?

   c. Did you reach a verdict? (Simply answer "yes" or "no"—do not tell us whether it was a "guilty" or "not guilty" verdict)

   d. If it was a criminal case, what were the charges against the defendant?

7. Have you, or a family member, or a close friend had any training in or been involved in law enforcement?

8. Do you or any of your relatives/ close friends have any legal training or experience?

9. Would the fact that witness is a member of law enforcement cause you to automatically believe or disbelieve his or her testimony?

10. Have you or anyone close to you had any contact with law enforcement either of a positive or negative nature (Including traffic tickets), that might influence you in this case?

11. Do you have any friends or relative who have contact with the criminal justice system? (E.g. Prosecutors, criminal defense attorneys, judges, courtroom staff.)

12. Have you or any member of your family or close personal friends ever been the victim of a crime?

13. Have you, or any member of your family, or any close personal friends ever been arrested, charged with a crime or ever been convicted of a crime?

14. Have you, or any member of your family, or close personal friends ever been a witness in a criminal case?

15. Will you have any difficulty in following the law as given to you by the judge, even if you may disagree with it?

16. Are you acquainted with the prosecutor, the defense attorney, the defendant, any of the courtroom staff, or any of the witnesses mentioned?

17. Is there anything about the nature of these charges that would make you favor one side or the other or which might make it difficult for you to sit as a juror in this matter?

18. Do you belong to any group/organization which takes a strong stand on issues related to the charges in this case?

19. Do you disagree with any rule of law or legal principle that was discussed during voir dire?

20. Can you think of any reason why you could not arrive at a fair and impartial verdict in this matter?